1

2

3

4

5                          UNITED STATES DISTRICT COURT

6                        NORTHERN DISTRICT OF CALIFORNIA

7

8  DAVID SMITH,                                No. C 07-674 MHP (pr)

9          Petitioner,                         **ORDER DENYING HABEAS
                                               PETITION**
10         v.

11 A. P. KANE, warden,

12         Respondent.
                                          /
13

14                              **INTRODUCTION**

15        David Smith, an inmate at the Correctional Training Facility in Soledad, filed this pro

16 se action seeking a writ of habeas corpus under 28 U.S.C. § 2254.  This matter is now before

17 the court for consideration of the merits of the habeas petition.  For the reasons discussed

18 below, the petition will be denied.

19                              **BACKGROUND**

20        Smith was convicted in Los Angeles County Superior Court of second degree murder

21 and was found to have used a firearm in the offense.  On February 22, 1988, he was

22 sentenced to a total of 17 years to life in prison.  His habeas petition does not challenge his

23 conviction but instead challenges an June 14, 2005 decision of the Board of Parole Hearings

24 ("BPH"), that found him not suitable for parole.   The hearing was Smith's third subsequent

25 parole hearing and was held at a time when he was 18 years into his 17-to-life sentence.

26        The BPH identified the circumstances of the commitment offense, Smith's history of

27 violent and assaultive conduct, his failure to sufficiently participate in beneficial self-help

28 programs such as an anger management program despite a previous recommendation that he

   do so, and his inadequate parole plans as the reasons for its decision that his release would

**United States District Court**
For the Northern District of California

1   pose an unreasonable risk of danger to society or threat to public safety.  The BPH also noted

2   the opposition to parole by the district attorney's office.

3          Smith sought relief in the California courts.  The Los Angeles County Superior Court

4   denied his petition for writ of habeas corpus in a reasoned decision.  The California Court of

5   Appeal summarily denied his petition for writ of habeas corpus.  The California Supreme

6   Court summarily denied his petition for review.

7          Smith then filed his federal petition for a writ of habeas corpus.  The court found

8   cognizable his claim that his right to due process was violated because the evidence was

9   insufficient to support the BPH's decision that he was unsuitable for parole.  Respondent

10  filed an answer and Smith filed a traverse.  Although it was not identified in the order to

11  show cause, the parties also briefed an Apprendi claim concerning the parole denial.

12         The court had intended to wait for guidance from the anticipated en banc decision in

13  Hayward v. Marshall, 512 F.3d 536 (9th Cir.), reh'g en banc granted, 527 F.3d 797 (9th Cir.

14  2008).  Although much time has passed, Hayward remains pending in the appellate court and

15  it is unknown to this court when the decision will be released.  The court will proceed to

16  decide the merits of the petition without the benefit of the Hayward decision.

17                                    **JURISDICTION AND VENUE**

18         This court has subject matter jurisdiction over this habeas action for relief under 28

19  U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because the challenged

20  action concerns the execution of the sentence of a prisoner housed at a prison in Monterey

21  County, within this judicial district.  28 U.S.C. §§ 84, 2241(d).

22                                           **EXHAUSTION**

23         Prisoners in state custody who wish to challenge collaterally in federal habeas

24  proceedings either the fact or length of their confinement are required first to exhaust state

25  judicial remedies, either on direct appeal or through collateral proceedings, by presenting the

26  highest state court available with a fair opportunity to rule on the merits of each and every

27  claim they seek to raise in federal court.  See 28 U.S.C. § 2254(b), (c).  The parties do not

28  dispute that state court remedies were exhausted for the claim asserted in the petition.

2

1                              **STANDARD OF REVIEW**

2              This court may entertain a petition for writ of habeas corpus "in behalf of a person in

3     custody pursuant to the judgment of a State court only on the ground that he is in custody in

4     violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

5     The petition may not be granted with respect to any claim that was adjudicated on the merits

6     in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that

7     was contrary to, or involved an unreasonable application of, clearly established Federal law,

8     as determined by the Supreme Court of the United States; or (2) resulted in a decision that

9     was based on an unreasonable determination of the facts in light of the evidence presented in

10    the State court proceeding."  28 U.S.C. § 2254(d); see Williams (Terry) v. Taylor, 529 U.S.

11    362, 409-13 (2000).   Section 2254(d) applies to a habeas petition from a state prisoner

12    challenging the denial of parole.  See Sass v. California Board of Prison Terms, 461 F.3d

13    1123, 1126-27 (9th Cir. 2006).

14                                  **DISCUSSION**

15    A.       Due Process Requires That Some Evidence Support a Parole Denial

16             A California prisoner with a sentence of a term of years to life with the possibility of

17    parole has a protected liberty interest in release on parole and therefore a right to due process

18    in the parole suitability  proceedings.  See Sass, 461 F.3d at 1127-28; Board of Pardons v.

19    Allen, 482 U.S. 369 (1987); Greenholtz v. Inmates of Nebraska Penal & Corr. Complex, 442

20    U.S. 1 (1979); Cal. Penal Code § 3041(b).

21             A parole board's decision satisfies the requirements of due process if "some evidence"

22    supports the decision.  Sass, 461 F.3d at 1128-29 (adopting some evidence standard for

23    disciplinary hearings outlined in Superintendent v. Hill, 472 U.S. 445, 454-55 (1985)).  "To

24    determine whether the some evidence standard is met 'does not require examination of the

25    entire record, independent assessment of the credibility of witnesses, or weighing of the

26    evidence.  Instead, the relevant question is whether there is any evidence in the record that

27    could support the conclusion reached'" by the BPH.  Sass, 461 F.3d at 1128 (quoting

28    Superintendent v. Hill, 472 U.S. at 455-56).  The "some evidence standard is minimal, and

                                        3

1    assures that 'the record is not so devoid of evidence that the findings of the . . . board were

2    without support or otherwise arbitrary.'"  Id. at 1129 (quoting Superintendent v. Hill, 472

3    U.S. at 457).  The some evidence standard of Superintendent v. Hill is clearly established law

4    in the parole context for purposes of § 2254(d).  Sass, 461 F.3d at 1129.  As a matter of state

5    law, the parole authority's decision must also satisfy the "some evidence" standard of review.

6    See In re Lawrence, 44 Cal. 4th 1181, 1191 (Cal. 2008) (state court "standard of review

7    properly is characterized as whether 'some evidence' supports the conclusion that the inmate

8    is unsuitable for parole because he or she currently is dangerous").

9         Having determined that there is a due process right, and that some evidence is the

10   evidentiary standard for judicial review, the next step is to look to state law because that sets

11   the criteria to which the some evidence standard applies.  One must look to state law to

12   answer the question, "'some evidence' of what?"

13   B.    State Law Standards For Parole For Murderers In California

14        California uses indeterminate sentences for most non-capital murderers, with the term

15   being life imprisonment and parole eligibility after a certain minimum number of years.  A

16   first degree murder conviction yields a minimum term of 25 years to life and a second degree

17   murder conviction yields a minimum term of 15 years to life imprisonment.  See In re

18   Dannenberg, 34 Cal. 4th 1061, 1078 (Cal. 2005); Cal. Penal Code § 190.  The upshot of

19   California's parole scheme described below is that a release date normally must be set unless

20   various factors exist, but the "unless" qualifier is substantial.

21        A BPH panel meets with an inmate one year before the prisoner's minimum eligible

22   release date "and shall normally set a parole release date. . . . The release date shall be set in a

23   manner that will provide uniform terms for offenses of similar gravity and magnitude in

24   respect to their threat to the public, and that will comply with the sentencing rules that the

25   Judicial Council may issue and any sentencing information relevant to the setting of parole

26   release dates."  Cal. Penal Code § 3041(a).  Significantly, that statute also provides that the

27   panel "shall set a release date unless it determines that the gravity of the current convicted

28   offense or offenses, or the timing and gravity of current or past convicted offense or offenses,

4

1  is such that consideration of the public safety requires a more lengthy period of incarceration

2  for this individual, and that a parole date, therefore, cannot be fixed at this meeting."  Cal.

3  Penal Code § 3041(b).

4          One of the implementing regulations, 15 Cal. Code Regs. § 2401, provides:  "A parole

5  date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c).  A

6  parole date shall be set if the prisoner is found suitable for parole under Section 2402(d).  A

7  parole date set under this article shall be set in a manner that provides uniform terms for

8  offenses of similar gravity and magnitude with respect to the threat to the public."[1]  The

9  regulation also provides that "[t]he panel shall first determine whether the life prisoner is

10 suitable for release on parole.  Regardless of the length of time served, a life prisoner shall be

11 found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose

12 an unreasonable risk of danger to society if released from prison." 15 Cal. Code Regs. §

13 2402(a). The panel may consider all relevant and reliable information available to it.  15 Cal.

14 Code Regs. § 2402(b).

15         The regulations contain a matrix of suggested base terms for several categories of

16 crimes.  See 15 Cal. Code Regs. § 2403.  For example, for second degree murders, the matrix

17 of base terms ranges from the low of 15, 16, or 17 years to a high of 19, 20, or 21 years,

18 depending on some of the facts of the crime.  The statutory scheme places individual

19 suitability for parole above a prisoner's expectancy in early setting of a fixed date designed to

20 ensure term uniformity.  Dannenberg, 34 Cal. 4th at 1070-71.  Under state law, the matrix is

21 not reached unless and until the prisoner is found suitable for parole.  Id. at 1070-71; 15 Cal.

22 Code Regs. § 2403(a).

23         The "Penal Code and corresponding regulations establish that the fundamental

24 consideration in parole decisions is public safety . . . [T]he core determination of 'public

25 safety' under the statute and corresponding regulations involves an assessment of an inmate's

26 current dangerousness."  Lawrence, 44 Cal. 4th at 1205 (emphasis in source).[2]

27         A critical issue in parole denial cases concerns the parole authority's use of evidence

28 about the murder that led to the conviction.  Three Ninth Circuit cases provide the guideposts

1  for applying the <u>Superintendent v. Hill</u> some evidence standard on this point: <u>Biggs v.</u>

2  <u>Terhune</u>, 334 F.3d 910 (9th Cir. 2003), <u>Sass</u>, 461 F.3d 1123, and <u>Irons v. Carey</u>, 505 F.3d

3  846 (9th Cir. 2007).[3]  <u>Biggs</u> explained that the value of the criminal offense fades over time

4  as a predictor of parole suitability:  "The Parole Board's decision is one of 'equity' and

5  requires a careful balancing and assessment of the factors considered. . . .  A continued

6  reliance in the future on an unchanging factor, the circumstance of the offense and conduct

7  prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system

8  and could result in a due process violation."  <u>Biggs</u>, 334 F.3d at 916-17.  <u>Biggs</u> upheld the

9  initial denial of a parole release date based solely on the nature of the crime and the

10  prisoner's conduct before incarceration, but cautioned that "[o]ver time . . ., should Biggs

11  continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a

12  parole date simply because of the nature of Biggs' offense and prior conduct would raise

13  serious questions involving his liberty interest in parole."  <u>Id.</u> at 916.  Next came <u>Sass</u>, which

14  criticized the <u>Biggs</u> statements as improper and beyond the scope of the dispute before the

15  court:  "Under AEDPA it is not our function to speculate about how future parole hearings

16  could proceed."  <u>Sass</u>, 461 F.3d at 1129.  <u>Sass</u> determined that the parole board is not

17  precluded from relying on unchanging factors such as the circumstances of the commitment

18  offense or the petitioner's pre-offense behavior in determining parole suitability.  <u>See</u> <u>id.</u>

19  (commitment offenses in combination with prior offenses provided some evidence to support

20  denial of parole at subsequent parole consideration hearing).  <u>Sass</u> also put to rest any idea

21  from <u>Biggs</u> that the commitment crime and pre-offense behavior only support the initial

22  denial of parole.  <u>Irons</u> determined that due process was not violated by the use of the

23  commitment offense and pre-offense criminality to deny parole for a prisoner 16 years into

24  his 17-to-life sentence.  <u>Irons</u> emphasized that all three cases (<u>Irons</u>, <u>Sass</u> and <u>Biggs</u>) in

25  which the court had "held that a parole board's decision to deem a prisoner unsuitable for

26  parole solely on the basis of his commitment offense comports with due process, the decision

27  was made before the inmate had served the minimum number of years required by his

28  sentence."  <u>Irons</u>, 505 F.3d at 853.  Interpreting this statement from <u>Irons</u> to suggest that the

1  offense can only be relied on until the minimum number of years has been reached would

2  suffer the same problem that Sass identified in Biggs: it is not the holding of the case.  The

3  dicta in Biggs and Irons are speculative and do not determine when a denial of parole based

4  solely upon the commitment offense or pre-offense behavior violates due process.  Neither

5  logic nor Irons compel a decision that such reliance must cease when the prisoner reaches the

6  minimum number of years in his sentence, such as the fifteenth year of a 15-to-life sentence.

7          The upshot of these three cases is that the BPH can look at immutable events, such as

8  the nature of the conviction offense and pre-conviction criminality, to predict that the

9  prisoner is not currently suitable for parole even after the initial denial (Sass), but the weight

10  to be attributed to those immutable events should decrease over time as a predictor of future

11  dangerousness as the years pass and the prisoner demonstrates favorable behavior (Biggs and

12  Irons). Sass did not dispute the principle that, other things being equal, a murder committed

13  50 years ago is less probative of a prisoner's current dangerousness than one committed 10

14  years ago.  Not only does the passage of time in prison count for something, exemplary

15  behavior and rehabilitation in prison count for something according to Biggs and Irons.

16  Superintendent v. Hill's standard might be quite low, but it does require that the decision not

17  be arbitrary, and reliance on only the facts of the crime might eventually make for an

18  arbitrary decision.[4]

19   C.     Some Evidence Supports The BPH's Decision In Smith's Case

20          1.      BPH Decision

21          The BPH identified the circumstances of the commitment offense, Smith's history of

22  violent and assaultive conduct, his failure to sufficiently participate in beneficial self-help

23  programs such as an anger management program, and his inadequate parole plans as the

24  reasons for its decision that his release would pose an unreasonable risk of danger to society

25  or threat to public safety.  The BPH also noted the opposition to parole by the district

26  attorney's office.  In its decision, the BPH noted that there were positive factors in favor of

27  Smith, most notably, that he had never received any CDC-115 rule violation reports and had

28  received only three CDC-128 counseling chronos (the last of which was in 1998 for a

1  grooming issue).  The BPH also noted that he had a generally supportive psychological

2  report, had no alcohol or substance abuse problem, had finished two vocational programs,

3  and had positive work evaluations.  Nonetheless, the positive aspects of his behavior did not

4  outweigh the factors of unsuitability, in the BPH's view.  The parole hearing was unusual in

5  that Smith opted not to attend because he did not want to be in the minimal restraints one of

6  the commissioners generally required for prisoners at parole hearings.

7              a.      Commitment Offense

8          In finding Smith unsuitable, the BPH stated that the commitment offense "was carried

9  out in an especially callous manner," "demonstrates an exceptional callous disregard for

10  human suffering," and was done for an inexplicable and very trivial motive.  Resp. Exh. 3,

11  6/14/05 BPH hearing reporter's transcript ("RT"), p. 42.  The circumstances of the

12  commitment offense could be considered as tending to indicate unsuitability.  See 15 Cal.

13  Code Regs. § 2402(c)(1).

14          The BPH read from the probation officer's report, which had described the crime.

15  "On April 7, 1987 at 11:00 a.m., the defendant shot and killed the victim, his wife, at their

16  home. . . .  While engaged in a verbal altercation with her, the defendant became angry and

17  pointed a loaded .44 caliber handgun at the victim.  He pulled the trigger, fired one shot and

18  struck her in the neck."  Resp. Exh. 2 at 2; RT 12-13.  That probation officer's report also

19  stated that the victim's mother told the probation officer that her daughter had called her a

20  few months before the shooting and told her that "the defendant had been drinking a lot and

21  probably using drugs.  Subsequently, he had beaten her several times."  Resp. Exh. 2 at 3.

22  The victim's mother also told the probation officer that when she came to Los Angeles

23  several months after the murder, "she was told by at least three people that the defendant had

24  pulled guns on them."  Id. at 3-4.  The autopsy report showed powder residue in the wound

25  that would indicate that the weapon was placed against the victim's body when fired.  Id. at

26  13.  When questioned by police, Smith initially told one story and then changed it, although

27  he apparently claimed consistently that he did not intend to shoot his wife, but only to

28  frighten her.  Id.

1                     b.       History Of Violent And Assaultive Conduct

2              The BPH also relied on Smith's record of violence and assaultive conduct in reaching

3    its decision that he was not suitable for parole.  RT 43; see also RT 45 (noting Smith's history

4    of unstable relationships with others)  There was evidentiary support for the BPH's concern

5    about Smith's conduct, even if it had not resulted in felony convictions.  First, Smith had

6    been arrested in 1974 for assault with a deadly weapon and inflicting injury on his wife or

7    child.  The district attorney rejected the charges, so there was no conviction.  Resp. Exh. 2 at

8    5.  Although the police department record had been destroyed, Smith told the probation

9    officer that he threatened his first wife with a stick and that his wife told police that he had

10   beaten her with a stick.  Id  Second, he had been arrested in 1983 for battery, hit and run with

11   property damage, and obstructing or resisting a peace officer.  He resolved that case by

12   entering a no contest plea to misdemeanor hit and run.  Id.  According to the probation

13   officers' report, police officers went to Smith's home to investigate a report of a stolen

14   vehicle and, during the course of the investigation, advised Smith that he was a suspect and

15   would be cited.  Smith reportedly "became agitated and told officers, 'get out of my house.'

16   [Smith] then pushed the officer and was restrained.  Once under arrest for battery, [Smith]

17   was taken to the hit and run scene and identified by the victim."  Id.  Smith stated that he had

18   merely brushed by the officer as he moved away from his chair.  Id. at 5-6.  Third, as noted

19   earlier, the probation officer wrote that the victim's mother had told him that Smith

20   reportedly had beaten the victim several times in the months before the killing and that Smith

21   had pulled a gun on three different people.  Id. at 3-4.

22            Interestingly, this information provided evidence of a history of violent and assaultive

23   conduct as the BPH noted, even though Smith suffered no felony convictions.  The probation

24   officer recognized the inconsistency as he stated that Smith had a "relatively minor known

25   criminal history" but both of his prior contacts with law enforcement "had elements of overly

26   aggressive and assaultive behavior."  Id. at 13-14.  The BPH reasonably could consider on

27   the underlying assaultive conduct as to which there was reliable evidence, even if it had not

28   resulted in a conviction for an assault.  It is the violent or criminal activity more than the

                                                         9

1  getting caught or punished that would be predictive of one's future dangerousness.

2              c.      Need For Further Self-Help Programming

3          In finding Smith unsuitable for parole, the BPH also relied on the fact that Smith "has

4  not sufficiently participated in beneficial self-help therapy programs such as anger

5  management." RT 43.   The BPH noted that Smith had not taken anger management course

6  as recommended in the last BPH decision two years earlier.  RT 44; see RT 25.   In fact,

7  Smith had not done any self-help programming since 2000, even though he had done some in

8  the earlier years of his incarceration.  RT 27, 29.   The BPH's decision indicates that the self-

9  help therapy, especially anger management programming, was related to this particular

10  inmate's  history of violence and assaultive conduct.  See RT 44-45, see also RT 30 and

11  Resp. Exh. 4 at 3 (Smith admitted to psychologist that "poor anger control, poor judgment,

12  and impulsivity contributed significantly to the instant offense").

13              d.      Inadequate Parole Plans

14          The BPH also relied on Smith's inadequate parole plans in finding him unsuitable.  RT

15  44.  The specific concern was that Smith did not have a place to live or any job offer in

16  California.  He had offers to live with family members in Maryland, but those would not help

17  him if he was paroled to a location in California.  See RT 14, 17-18.  He had a letter that

18  showed parole services of some sort existed in Los Angeles, but the nature of those services

19  was not stated at the hearing.  RT 17.

20          2.      State Court Decision

21          The Los Angeles County Superior Court rejected Smith's habeas petition in a reasoned

22  decision.  Resp. Exh. 7.  The court issued its ruling based on Smith's petition (with the

23  transcript attached) before respondent was ordered to file an answer.  Consequently, the court

24  did not have the documentation that the BPH had considered.  See Resp. Exh. 6.

25  Understanding that the superior court had a limited record helps one understand some of the

26  statements in that court's decision, e.g., the statement that the record lacked sufficient

27  information for the court to determine whether the BPH mischaracterized the offense.

28          The superior court noted the various factors that the BPH had relied on to find Smith

1    unsuitable for parole, and then considered the suitability decision.  The court noted that the

2    BPH had cited to confidential information, which is permissible under the regulations but

3    which could not be considered by the court in evaluating the some evidence claim because

4    the confidential information had not been discussed by the BPH "with sufficient detail for the

5    court to consider how it supported their decision." Resp. Exh. 7 at 2.  The state court also

6    determined that the record regarding the circumstances of the murder was not sufficient for

7    the court to determine whether the BPH had some evidence to determine that Smith "acted in

8    an especially heinous, atrocious or cruel manner.'" Id. at 2.   The superior court apparently

9    relied on the statements in the parole hearing itself to find that there was some evidence of

10   earlier violence, unrealistic parole plans, insufficient self-help programming, and an unstable

11   social history.  Based on a review of the record it had and giving deference to the broad

12   discretion of the parole board, the superior court concluded that "the record contains 'some

13   evidence' to support the Board's finding that Petitioner is unsuitable for parole." Id. at 1.

14          3.     Analysis Of Federal Claim

15          This court applies § 2254(d) to the Los Angeles County Superior Court's decision

16   because it is the last reasoned decision from a state court on Smith's claim. See Ylst v.

17   Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th

18   Cir. 2005).  The superior court correctly identified the "some evidence" standard as the

19   applicable standard for judicial review, as evidenced by its citation to In re Rosenkrantz, 29

20   Cal. 4th 616 (Cal. 2002), which had cited and adopted the Superintendent v. Hill some

21   evidence standard as the proper standard for judicial review of evidentiary sufficiency for

22   administrative cases. See Rosenkrantz, 29 Cal. 4th at 665-67.

23          The state court determined that the record regarding the circumstances of the murder

24   was not sufficient for the court to determine whether the Board had some evidence to

25   determine that Smith "acted in an especially heinous, atrocious or cruel manner.'" Id. at 2.

26   Contrary to Smith's assertion, this was not a determination that there was insufficient

27   evidence that the crime was committed in an especially heinous, atrocious or cruel manner,

28   but instead was merely an acknowledgment that the record Smith had submitted to the

1   superior court did not have enough information for the court to make the determination.  The

2   record Smith submitted to the state court did not include the probation officer's report that

3   had additional details (such as that the victim was shot at very close range) beyond those in

4   the short description of the killing that the BPH commissioner read into the record.

5          The superior court did find that there was some evidence a previous record of

6   violence, unrealistic parole plans, insufficient self-help programming, and an unstable social

7   history.  Resp. Exh. 7 at 2.  Unfortunately, the state court got one of the details wrong when

8   it stated that Smith's prior battery conviction provided some evidence that he had inflicted or

9   attempted to inflict serious injury on a victim; this was incorrect because there had been an

10  arrest for battery and other crimes but the case was resolved with a no-contest plea only to

11  misdemeanor hit-and-run.  See RT 13; Resp. Exh. 2 at 5.  Although the superior court

12  mistakenly stated there was a battery conviction, it correctly noted that there was evidence

13  about domestic violence problems Smith had with both his first and second wives, and

14  "towards three other individuals," which were the incidents the BPH commissioners

15  mentioned at the hearing as coming from the probation officer's report.  See Resp. Exh. 7 at

16  3; RT 30, 32-33, 36.   The superior court used this information as evidence of an unstable

17  social history, but this same evidence provides support for BPH's determination that he had a

18  record of assaultive or violent conduct.  Whether considered in the category of an unstable

19  social history or in the category of assaultive/violent conduct, the evidence did exist and was

20  detrimental to Smith's parole chances.   Further, the superior court's other determinations had

21  support in the record.  Smith did not have "solidified parole plans in California," Resp. Exh.

22  7 at 3, because he planned to live with his brother but his brother had not sent a letter

23  extending any offer to house his brother even though other relatives on the East Coast said

24  Smith could live there.  RT 18-20, 37.   Smith had not attended anger management classes or

25  any self-help classes since the year 2000.  See Resp. Exh. 7 at 3; RT 27, 29.

26          The superior court did not unreasonably apply Superintendent v. Hill in determining

27  that there was some evidence to support the BPH's decision.  Notwithstanding some positive

28  factors for Smith, the BPH had determined that, 18 years into his 17-to-life sentence, Smith

12

1  posed an unreasonable risk of danger to society if released from prison because of the murder

2  plus his history of violent and assaultive conduct, his failure to sufficiently participate in

3  beneficial self-help programs, and his inadequate parole plans.  There is a rational connection

4  between the evidence relied on and the decision that he is a current threat.  Shooting one's

5  wife at point-blank range would qualify as an offense carried out in a manner which

6  demonstrates an exceptionally callous disregard for human suffering.  The BPH was not

7  obliged to accept Smith's story that he had shot his wife by accident.  Although the murder

8  was obviously a very large factor in its decision, the BPH did not rely solely on the murder

9  and instead properly relied on the murder plus a combination of several other factors.   The

10  panel is authorized by regulation to consider all relevant and reliable information available to

11  it.  See 15 Cal. Code Regs. § 2402(b).  Also, "[c]ircumstances which taken alone may not

12  firmly establish unsuitability for parole may contribute to a pattern which results in a finding

13  of unsuitability."  Id.  Bearing in mind that the court's chore is to consider not whether some

14  evidence supports the reasons, but whether some evidence supports the conclusion that

15  Smith's release unreasonably endangers public safety, this court concludes that the Los

16  Angeles County Superior Court's rejection of his insufficient evidence claim was not

17  contrary to or an unreasonable application of the Superintendent v. Hill some evidence

18  standard.

19         Smith argues that the state court wrongly denied him an evidentiary hearing to

20  develop the facts about his prior criminal activity.  The place for Smith to present

21  information about the nature of the prior criminal episode was at the parole hearing, which he

22  chose not to attend.  An evidentiary hearing would not have helped him because of the nature

23  of a "some evidence" claim: it requires the state court, like this court, to review whether there

24  was some evidence in the record available to the BPH to support the BPH's decision.  For

25  example, on the question of whether he had engaged in a battery and had a battery

26  conviction, the issue for the state court was not whether Smith had committed a battery or

27  had a battery conviction but instead was whether there was evidence in the record before the

28  BPH that he had committed a battery or had a battery conviction.  Smith also could not

1    develop that kind of evidence here because this court's some evidence review has the same

2    limit as the state court's review.  In any event, this court agrees that there is not evidence in

3    the record of a battery conviction: (a) the probation officer's report states that there was an

4    arrest for a battery but not a conviction for battery, (b) the BPH did not specifically state that

5    Smith had a battery conviction, and (c) the state superior court mistakenly said that the BPH

6    cited Smith's battery conviction as evidence that he had inflicted or attempted to inflict

7    serious injury on a victim.

8

9    D.      *Apprendi* Argument

10         Smith contends that the BPH's decision finding him unsuitable for parole increased his

11   punishment in violation of the rule in Apprendi in that the BPH used circumstances for which

12   there were not findings of fact by a jury.  See Petition attachment, p. 4. This argument fails

13   because the Sixth Amendment right to jury trial was not implicated, let alone violated, by

14   anything the BPH did in considering Smith's case.

15         The rule from a line of cases that started with Apprendi v. New Jersey, 530 U.S. 466

16   (2000), is that, "under the Sixth Amendment, any fact that exposes a defendant to a greater

17   potential sentence [than the statutory maximum] must be found by a jury, not a judge, and

18   established beyond a reasonable doubt, not merely by a preponderance of the evidence."

19   Cunningham v. California, 549 U.S. 270, 281 (2007).  The relevant statutory maximum "'is

20   not the maximum sentence a judge may impose after finding additional fact, but the

21   maximum he may impose without any additional findings."  Id. at 274 (quoting Blakely v.

22   Washington, 542 U.S. 296 303-04 (2004)).

23         Smith's Apprendi argument runs into the insurmountable hurdle that the statutory

24   maximum for his crime is life imprisonment.  The maximum sentence allowed under

25   California law following a  fact-finder's guilty verdict on the second degree murder charge is

26   life imprisonment.  See Cal. Penal Code § 190.  No additional facts need to be found beyond

27   those which were found by the trier of fact in his 1987 trial in order for Smith to be kept in

28   prison for the rest of his life.  Nothing the BPH did has caused Smith's sentence to extend

1   beyond the life maximum to which he was sentenced and for which he may be imprisoned

2   based on the second degree murder conviction.  He has no right to jury trial in connection

3   with any decision whether to release him before the expiration of his life maximum term.

4   That the <u>Apprendi</u> line of cases does not apply is evidenced by the fact that an indeterminate

5   sentencing scheme is one of the proposed solutions to the jury trial problems caused by

6   determinate sentencing schemes the Court has invalidated.  <u>See, e.g.</u>, <u>Blakely</u>, 542 U.S. at

7   305 (citing with approval <u>Williams v. New York</u>, 337 U.S. 241 (1986) (judge's consideration

8   of facts outside the trial record to decide whether to sentence defendant to death did not

9   violate the jury trial right because the indeterminate sentencing scheme allowed the judge to

10  sentence the defendant to death or imprisonment)); <u>see also</u> <u>id.</u> at 332 (Breyer, J., dissenting)

11  (noting that one of the alternatives to Guidelines-type sentencing scheme is indeterminate

12  sentencing, such as California's former system).  In <u>Blakely</u>, the Court explained that

13  indeterminate sentencing that gives a judge greater judicial power to set a sentence does not

14  infringe on the province of the jury: "It increases judicial discretion, to be sure, but not at the

15  expense of the jury's traditional function of finding the facts essential to the lawful

16  imposition of the penalty.  Of course, indeterminate schemes involve judicial factfinding, in

17  that a judge (like a parole board) may implicitly rule on those facts he deems important to the

18  exercise of his sentencing discretion.  But the facts do not pertain to whether the defendant

19  has a legal <u>right</u> to a lesser sentence–and that makes all the difference insofar as judicial

20  impingement upon the traditional role of the jury is concerned." <u>Blakely</u>, 542 U.S. at 308-09.

21  The <u>Apprendi</u> claim is rejected.

22  <center>**CONCLUSION**</center>

23          For the foregoing reasons, the petition is denied on the merits.  The clerk shall close

24  the file.

25          IT IS SO ORDERED.

26  DATED: March 26, 2010

                                                    Marilyn Hall Patel
27                                                  United States District Judge

28

<center>15</center>

1

**NOTES**

2

1.      The listed circumstances tending to show <u>unsuitability</u> for parole are the nature of the
3    commitment offense, i.e., whether the prisoner committed the offense in "an especially
heinous, atrocious or cruel manner;" the prisoner has a previous record of violence; the
4    prisoner has an unstable social history, the prisoner previously engaged in a sadistic sexual
offense, the prisoner has a lengthy history of severe mental problems related to the offense;
5    and negative institutional behavior.  15 Cal. Code Regs. § 2402(c).  The listed circumstances
tending to show <u>suitability</u> for parole are the absence of a juvenile record, stable social
6    history, signs of remorse, a stressful motivation for the crime, whether the prisoner suffered
from battered woman's syndrome, lack of criminal history, the present age reduces the
7    probability of recidivism, the prisoner has made realistic plans for release or developed
marketable skills, and positive institutional behavior.  15 Cal. Code Regs. § 2402(d).

8

2.      The California Supreme Court's determination in <u>Lawrence</u>, 44 Cal. 4th 1181, that state
9    law requires the parole authority to determine whether the inmate is unsuitable for parole
because he currently is dangerous is binding in this federal habeas action.  <u>See</u> <u>Hicks v.</u>
10   <u>Feiock</u>, 485 U.S. 624, 629-30 (1988).  However, <u>Lawrence</u> does not govern this court's
analysis in every respect.  This court is not bound by the discussion in <u>Lawrence</u>
11   (<u>see</u> footnote 4, <u>infra</u>) as to the evaluation of the commitment offense in determining whether
the parole applicant currently is dangerous.  As to that point, <u>Lawrence</u> is persuasive
12   authority, while the Ninth Circuit's holdings in <u>Sass</u>, <u>Biggs</u>, and <u>Irons</u> are binding authority.
Also, <u>Lawrence</u>'s determination that "some evidence" is the proper standard of judicial
13   review, 44 Cal. 4th at 1211-12, does not bind this court because it is a state court decision
and, in any event, was not determining the standard required by the federal constitution.

14

3.      <u>En</u> <u>banc</u> review is now pending in a fourth case regarding the some evidence standard,
15   <u>Hayward v. Marshall</u>, 512 F.3d 536 (9th Cir.), <u>reh'g en banc granted</u>, 527 F.3d 797 (9th Cir.
2008).  The order granting <u>en</u> <u>banc</u> review states that the panel opinion is of no precedential
16   value.

17   4.      The California Supreme Court discussed the use of the commitment crime
to deny parole in the companion cases of <u>Lawrence</u>, 44 Cal. 4th 1181, and <u>In re Shaputis</u>, 44
18   Cal. 4th 1241 (Cal. 2008).  The court explained that where "evidence of the inmate's
rehabilitation and suitability for parole under the governing statutes and regulations is
19   overwhelming, the only evidence related to unsuitability is the gravity of the commitment
offense, and that offense is both temporally remote and mitigated by circumstances
20   indicating the conduct is unlikely to recur, the immutable circumstance that the commitment
offense involved aggravated conduct does not provide 'some evidence' <u>inevitably</u> supporting
21   the ultimate decision that the inmate remains a threat to public safety."  <u>Lawrence</u>, 44 Cal.
4th at 1191 (emphasis in source).  Applying that rule, the court determined that there was not
22   some evidence to deny parole in <u>Lawrence</u> but that there was some evidence to deny parole
in <u>Shaputis</u>.

23

24

25

26

27

28

16